**Jeremy Wayne BALDWIN, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 14–06–00632–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 25, 2007.

Jesus Vargas, San Antonio, TX, for appellants.

Eric Kugler, Houston, TX, for appellees.

Panel consists of Justices YATES, ANDERSON, and HUDSON.

## MAJORITY OPINION

J. HARVEY HUDSON, Justice.

Appellant, Jeremy Wayne Baldwin, was charged by indictment with possession of cocaine. The indictment also contained two enhancement paragraphs. Prior to trial, appellant filed a motion to suppress which, after a hearing, was denied by the trial court. Pursuant to a plea bargain agreement, appellant then entered a plea of guilty to the offense of possession and a plea of true to the enhancement allegations. In compliance with the plea bargain agreement, the trial court assessed appellant's punishment at confinement in the state penitentiary for a term of three years. In a single point of error, appellant contends the trial court erred in overruling his motion to suppress. We affirm.

The record reflects that Deputy Tommy Smith of the Harris County Sheriff's Office was, on November 3, 2005, working as the contract deputy patrolling the Turtle Lake subdivision. Around ten o'clock that evening, Deputy Smith was flagged down by a middle-aged female citizen. The woman, who was holding a cell phone, told Deputy Smith that she had just called the police to report what she believed to be suspicious activity. She told Deputy Smith that she had seen a white male, dressed in black, walking around looking into houses. She also informed Deputy Smith she did not recognize the man to be from the neighborhood. The woman was aware, as was Deputy Smith, there had been a string of recent burglaries in the neighborhood.

Although Deputy Smith recognized the woman as being a neighborhood resident from his frequent patrolling and had previously spoken to her in passing, she was reluctant to give him any contact information because she said she did not want to be involved and did not want to have her name mentioned. While Deputy Smith had never had to rely on information provided by the woman before, he believed she was very credible and he had no reason to doubt her. The woman pointed out the direction she had last seen the man, and Deputy Smith quickly drove off in that direction, looking for the man in black.

Moments later, Deputy Smith saw appellant, dressed in black, walking on the sidewalk. As Deputy Smith approached

appellant, appellant turned around, saw Deputy Smith's patrol car, and began walking at a very fast pace. Deputy Smith caught up with appellant, exited his patrol car, and asked appellant for his identification. Appellant, who was visibly nervous, asked Deputy Smith why he wished to see his identification, and stated he had no right to stop him for walking down the street. Appellant also refused to make eye contact, scanned the area, and spoke quickly. Appellant did not produce any identification and, based on his unusual demeanor, Deputy Smith believed appellant was about to flee or fight. Fearing for his safety, Deputy Smith handcuffed the appellant.

After handcuffing appellant, Deputy Smith asked appellant where his identification was located. Appellant told him it was in his pants pocket. Deputy Smith reached into appellant's pocket and grabbed appellant's wallet pouch. Appellant's wallet pouch had a slot, with a clear plastic covering, on one side. Appellant's driver's license was in this slot, behind the plastic cover. Deputy Smith testified that, despite the clear plastic cover, parts of appellant's driver's license were obstructed, so he removed the license. Once he removed the license, he saw a small baggy containing a white powder in the same slot. Appellant immediately said: "That dope is not mine. I found it." Deputy Smith field tested the white powder and it tested positively as cocaine. Deputy Smith then arrested appellant.

On appeal, appellant contends any evidence obtained on the night of his detention and subsequent arrest was taken in violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 9, 10, and 19 of the Texas Constitution because the investigatory detention was not supported by reasonable suspicion

and his arrest was not supported by probable cause.

 In reviewing a ruling on a motion to suppress evidence, appellate courts afford almost total deference to the trial court's determination of the historical facts, while reviewing de novo mixed questions of law and fact not turning on an evaluation of credibility and demeanor. *State v. Garcia*, 25 S.W.3d 908, 911 (Tex. App.-Houston [14th Dist.] 2000, no pet.) (citing *Guzman v. State*, 955 S.W.2d 85, 87–88 (Tex.Crim.App.1997)). Questions of reasonable suspicion and probable cause are reviewed de novo on appeal. *Id.* This standard applies because the trial judge is not in an appreciably better position than the reviewing court to make the determination. *Id.* In this instance, the relevant facts are not in dispute and the resolution of this appeal does not turn on an evaluation of the credibility of the two witnesses. Therefore, we must review the trial court's ruling de novo and determine whether there was sufficient reasonable suspicion to detain appellant for the purpose of an investigation. *Id.*

 There are three distinct categories of interactions between police officers and citizens: encounters, investigative detentions, and arrests. *State v. Perez*, 85 S.W.3d 817, 819 (Tex.Crim.App.2002). Encounters occur when police officers approach an individual in public to ask questions. *Harper v. State*, 217 S.W.3d 672, 674 (Tex.App.-Amarillo 2007, no pet.). Encounters do not require any justification whatsoever on the part of an officer. *Id.* Because appellant was in a public place, Deputy Smith needed no probable cause or reasonable suspicion to engage him in conversation. Police officers "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by put-

ting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Perez*, 85 S.W.3d at 819. However, when appellant became nervous, refused to identify himself, and began acting strangely, Deputy Smith feared appellant was either going to fight or flee, and appellant was detained.

A stop is deemed an investigative detention when a police officer detains a person reasonably suspected of criminal activity to determine his identity or to momentarily maintain the status quo to garner more information. *Hoag v. State*, 728 S.W.2d 375, 380 (Tex.Crim.App.1987). Circumstances short of probable cause may justify a temporary detention for the purpose of investigation. *Garza v. State*, 771 S.W.2d 549, 558 (Tex.Crim.App.1989). A temporary detention is justified when the detaining officer has specific articulable facts which, taken together with rational inferences from those facts, lead him to conclude the person detained is, has been, or soon will be engaged in criminal activity. *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App.1997). The articulable facts used by the officer must create some reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to crime. *Myers v. State*, 203 S.W.3d 873, 882 (Tex.App.-Eastland 2006, pet. ref'd). A reasonable suspicion determination is made by considering the totality of the circumstances. *Ford v. State*, 158 S.W.3d 488, 492–93 (Tex.Crim.App.2005). An investigative detention must last no longer than necessary to effectuate the purpose of the stop and must involve actual investigation. *Akins v. State*, 202 S.W.3d 879, 885 (Tex.App.-Fort Worth 2006, pet. ref'd).

Here, appellant contends the woman who reported him to Deputy Smith was not known to be credible. More specifically, appellant claims her report was no more reliable than an anonymous tipster. However, Deputy Smith did not detain appellant based on the woman's report. Rather, he detained appellant only after a personal encounter with appellant on the street. Appellant's nervousness, shuddering, evasiveness, refusal to identify himself to a police officer, and manner of wearing all black clothing at 10:30 p.m. in a neighborhood where there had been a recent string of burglaries, coupled with the woman's report that she had seen appellant looking into houses, are indicative of criminal activity.

Moreover, a face-to-face tip from a private citizen is considered inherently trustworthy because the informant places himself in a position to be held accountable for his information if it proves to be false. *Garcia*, 25 S.W.3d at 913. In fact, the scenario presented here is, in many ways, similar to the one in *Garcia*.

In *Garcia*, an officer was stopped by an unidentified man in a gas station parking lot. The man told the officer he had witnessed three "boys" getting alcohol from their car and he believed the boys to be underage and drinking illegally. *Id.* at 910. The man pointed out the vehicle and the officer saw three youthful looking boys in the car. *Id.* The officer saw no other signs of illegal behavior, but approached the car to ask the driver for identification. *Id.* He observed signs of intoxication in Garcia, the driver, and asked him for permission to search the car. *Id.* at 911. The officer discovered no alcohol but found marijuana under the seat. *Id.* The man who reported the crime to the officer left without leaving his name or contact information. *Id.* Garcia and his passengers were charged with possession of marijua-

na. The trial court granted the defendants' motion to suppress, holding there was no reasonable suspicion for the initial stop, because the defendants "could just as well been [engaged in an] innocent permissible legal activity." *Id.* at 912. This court reversed, rejecting the "possible innocent permissible activity" formulation. *Id.* We held the individual who flagged down the officer was "inherently trustworthy" because he came forward in person and could have been held accountable for the information. *Id.* at 913. In addition, the information he provided was later corroborated by the officer's direct observation. *Id.*

■ Here, the information provided by the unidentified woman to Deputy Smith was similarly reliable. The woman approached Deputy Smith in the same way the unidentified man approached the officer in *Garcia.* She, too, appeared personally before the officer and, in doing so, assumed responsibility for the accuracy of the information and could easily have been held accountable for its truth. *See Hawes v. State,* 125 S.W.3d 535, 539–40 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding anonymous citizen informant was reliable based on "the mere willingness of the informant to place himself in a position where he *could* be identified" even though he never was actually identified by the officer) (emphasis in original). Deputy Smith, the contract patrol officer for the neighborhood, testified he had seen the woman on several previous occasions and recognized her as a resident of the neighborhood. If he and the woman were acquainted, she could reasonably assume she would see Deputy Smith again in the course of his duties, and Deputy Smith could have located her had he deemed it necessary. *See Bilyeu v. State,* 136 S.W.3d 691, 695 (Tex.App.-Texarkana 2004) (finding that, because unidentified citizen approached officers in his car, this would have allowed officers to identify him

by looking up his license plates had they so wished, and this fact increased informant's reliability). A previous relationship will establish a certain degree of reliability and trust, and it is unlikely she would give purposefully inaccurate information to an officer she saw on a frequent basis. *See Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (holding a face-to-face informant who was "known to" the officer was sufficiently reliable to establish reasonable suspicion). The woman had also made a previous call to an emergency dispatcher to send a patrol car, although the record does not reflect whether the woman identified herself to the emergency operator.

Deputy Smith, like the officer in *Garcia,* testified he had no reason to discredit the informant's statements. She told Deputy Smith a white male was "looking into houses and walking around" and further testified he "may have been" part of a recent string of thefts. Although it is unclear from this statement the exact actions of the man she saw, it is reasonable to assume the activity she saw led her to believe that appellant's actions were related to a crime. His actions were specific enough for the woman to believe him involved in the recent thefts and alarmed her enough to seek police intervention. *See State v. Fudge,* 42 S.W.3d 226, 232 (Tex.App.-Austin 2001, no pet.) (holding an unsolicited, face-to-face report from an unidentified cab driver that defendant driver was "all over the road" was specific enough in its allegations of illegality to be the sole basis of an investigative detention). Based on the content of the witness's statement and her credibility, Deputy Smith was justified in reasonably relying on the woman's information and seeking to corroborate that information with his own observation.

■ Appellant emphasizes the fact that no illegal activity was observed by either

the woman or Deputy Smith. However, there are instances when a person's conduct viewed "in a vacuum" appears purely innocent, but when viewed in light of the totality of the circumstances may give rise to reasonable suspicion. *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App.1997). Here, Deputy Smith acted on information from a woman he recognized, and the facts he observed corroborated enough of the details of her report to justify the investigation. She described appellant's physical description with enough accuracy to make him easily identifiable. Appellant fit the woman's description—a white male, wearing black clothing, and walking westward. *See Davis v. State*, 829 S.W.2d 218, 220 (Tex.Crim.App.1992) (holding that officers seeking corroboration of a report made permissible rational inferences of suspicion when suspect fitting description in report wore a trench coat on a warm day). As the neighborhood contract patrol officer, Smith was aware of a string of break-ins in the neighborhood in the weeks preceding appellant's arrest. Smith's first-hand knowledge and his training as a police officer might reasonably have led to the conclusion that a man walking alone at night dressed in black was worthy of investigation. *See U.S. v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (finding "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person"). As soon as Smith came into view, appellant quickened his pace and began to act nervous. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (holding the Supreme Court has recognized nervous, evasive behavior as a factor in finding reasonable suspicion in *Terry* stops, and unprovoked flight is suggestive of wrongdoing, though not proof of it); *Gaines v. State*, 99 S.W.3d 660, 666 (Tex.

App.-Houston [14th Dist.] 2003, no pet.) (holding defendant's nervous demeanor and "almost jogging" away from officers in an airport was sufficient to establish reasonable suspicion). Though none of these facts (the time of day, appellant's attire, appellant's behavior, appellant's apparent desire to avoid contact with Deputy Smith) would independently justify reasonable suspicion, when combined might cause a person of reasonable caution to believe that the action taken by Deputy Smith was appropriate, especially in response to the unsolicited report of a concerned citizen.

 The *possibility* of an innocent explanation does not deprive an officer of the capacity to entertain reasonable suspicion. *Woods*, 956 S.W.2d at 37. Both the United States Supreme Court and the Texas Court of Criminal Appeals have rejected the "innocent permissible legal activity" argument. *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Woods*, 956 S.W.2d at 37. Many actions may have both the appearance of legality and illegality, and the purpose of the investigative detention is to resolve that very ambiguity. *Woods*, 956 S.W.2d at 37.

 While appellant was handcuffed and temporarily detained, Deputy Smith again asked appellant for his identification. In fact, one purpose of a temporary detention is to fix the identity of the suspicious person. *Gearing v. State*, 685 S.W.2d 326, 327 (Tex.Crim.App.1985). Appellant informed Deputy Smith that his identification was in his pocket. Because appellant was handcuffed, he could not directly produce his identification. We find the momentary intrusion by Deputy Smith into appellant's pants pocket to retrieve his identification was a minimal, necessary, and reasonable encroachment upon appellant's liberty under the circumstances presented here. Certainly, we do not be-

lieve Deputy Smith was obliged to subject himself to harm by removing appellant's handcuffs for the purpose of allowing appellant to retrieve his own wallet. Thus, we find the trial court did not err in overruling appellant's motion to suppress.

Appellant's sole point of error is overruled, and the judgment of the trial court is affirmed.

ANDERSON, J., dissenting.

JOHN S. ANDERSON, Justice, dissenting.

The Fourth Amendment to the United States Constitution provides, in part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. At every level of the detention, search, and arrest of appellant, appellant's Fourth Amendment rights were violated by Deputy Smith. Nevertheless, the majority utilizes sophistry to sustain Deputy Smith's unlawful search and seizure, thus damaging appellant's reputation with an illegitimate arrest for merely walking down a public sidewalk. Therefore, I respectfully dissent.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. Appellant Goes For a Walk

Appellant testified that during the evening of November 3, 2005, he left his parents' home in the Turtle Lake subdivision to take a walk and smoke a cigarette. After a ten year absence, appellant had moved back into his parents' home about a week and a half before he was arrested on November 3, 2005.

#### B. Just the Facts, Ma'am

Deputy Tommy Smith, a Harris County Deputy Sheriff, testified that on November 3, 2005, he was working as the contract deputy patrolling the Turtle Lake subdivision, his regular assignment. According to Deputy Smith, Turtle Lake has a moderate crime rate. At about ten o'clock that evening, while patrolling the subdivision, Deputy Smith was flagged down by a middle-aged female citizen. While the citizen informed Deputy Smith she had reported her observations to the authorities by telephone, he was not dispatched to her as a result of her alleged report, but merely happened to see her as he was patrolling.[1] Deputy Smith recognized the citizen as someone who lived in the neighborhood. Deputy Smith did not know the citizen other than having seen her in the subdivision on several prior occasions. Deputy Smith did not obtain any contact information from the citizen, as she did not want to be involved and did not want her name mentioned. The anonymous citizen told Deputy Smith she had spotted a white male, dressed in black, walking around looking into homes. She also informed Deputy Smith she did not recognize the man in black to be from the neighborhood. The anonymous citizen also volunteered to Deputy Smith that she was aware there had been burglaries in the neighborhood, that she did not know if the man in black was part of those burglaries or not, but he may have been. Deputy Smith admitted during cross-examination that the anonymous citizen did not report seeing the man in black committing a crime and that she did not specify the manner in which the man in black was allegedly looking into houses or whether he approached the houses. The anonymous citizen pointed

---

1. The appellate record is devoid of evidence that the sheriff's dispatcher notified Deputy Smith of the anonymous citizen's report of a man in black walking down a public side-walk. I conclude that the dispatcher ignored the complaint; a reasonable inference from the facts.

out the direction she had last seen the man in black walking.

Deputy Smith testified that despite the fact he did not personally know the anonymous citizen, had previously spoken to her only in passing, and had never had to rely on any information she had given him in the past, he believed she was very credible and he had no reason to doubt her. Deputy Smith quickly drove off in the direction the anonymous citizen had indicated, looking for the man in black, even though he knew walking around a subdivision looking at windows was not against the law and he had received no reports that evening of any burglaries in the area. A few moments later, Deputy Smith saw appellant, dressed in black, walking on the sidewalk.

### C. Deputy Smith Detains Appellant

As Deputy Smith approached appellant in his patrol car, appellant turned around, saw Deputy Smith's patrol car, and began walking at a very fast pace; but not running. Deputy Smith quickly caught up with appellant, exited his patrol car, and asked appellant for his identification.[2] According to Deputy Smith, appellant did not refuse to produce his identification, but became nervous when he questioned why Deputy Smith wished to see his identification, and stated Deputy Smith had no right to stop him for walking down the street.[3] At that point, mere seconds after he had initially approached appellant, Deputy Smith handcuffed appellant. Deputy

Smith testified on cross-examination the only reason he handcuffed appellant was because appellant became nervous and anxious and it was his standard policy to handcuff suspects when they become nervous and anxious because, in his experience, they are about to run or fight.[4] Deputy Smith also testified that appellant had not refused to produce his identification prior to being handcuffed. Deputy Smith did not conduct a pat-down search of appellant for weapons prior to handcuffing appellant.

After he handcuffed appellant, Deputy Smith asked appellant where his identification was located. Appellant told him it was in his pants pocket. Deputy Smith reached into appellant's pocket and grabbed appellant's wallet pouch. Appellant's wallet pouch had a slot, with a clear plastic covering, on one side. Appellant's driver's license was in this slot, behind the plastic cover. Deputy Smith testified that, despite the clear plastic cover, parts of appellant's driver's license were obstructed, so he removed the license. Once he removed the license, he saw a small baggy containing a white powder in the same slot. According to Deputy Smith, appellant immediately said: "That dope is not mine. I found it." Deputy Smith field tested the white powder and it tested positive as cocaine. During the suppression hearing, Deputy Smith admitted appellant had not committed an illegal act in his presence until he discovered the cocaine.

2. At the time he was detained, appellant was approximately a block and a half from his parents' residence.

3. Appellant was correct when he stated that Deputy Smith did not have the legal authority to require that appellant produce his identification when Deputy Smith initially approached him. *See* Tex. Penal Code Ann. § 38.02(a) (Vernon 2003) (a person commits an offense *if he intentionally refuses to give* his identifying information to a peace officer who has lawfully arrested the person). Both

the State and the majority agree that because probable cause did not arise until after the discovery of the cocaine in appellant's wallet, that was the earliest point at which Deputy Smith could have lawfully arrested appellant and thus required him to produce his identification.

4. Deputy Smith testified appellant did not try to run at any time, had not refused to produce *his identification prior to being handcuffed,* only questioned why Deputy Smith wanted to see it, and did not resist being handcuffed.

Finally, Deputy Smith testified he did not arrest appellant until that point. In its brief filed with this court, the State concedes Deputy Smith did not have probable cause to arrest appellant until he discovered the cocaine inside appellant's wallet.

## DISCUSSION

Both state and federal courts recognize three categories of interaction between police and citizens: encounters, investigative detentions, and arrests. *Mount v. State*, 217 S.W.3d 716, 724 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Because there is a continuum of human interaction, what may begin as a consensual encounter can readily become an investigative detention, which may evolve into an arrest. *Josey v. State*, 981 S.W.2d 831, 838 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd). The majority holds that the initial contact between appellant and Deputy Smith began as an encounter, quickly escalated into an investigative detention, and culminated with appellant being arrested only when Deputy Smith discovered cocaine in appellant's wallet. As I disagree with the majority's progressive characterization of the incident at issue in this appeal, I address each level of potential interaction between a citizen and police in turn.

## A. Encounter

An encounter is a friendly exchange of pleasantries or mutually useful information. *Gaines v. State*, 99 S.W.3d 660, 666 (Tex.App.-Houston [14th Dist.] 2003, no pet.). An encounter does not implicate Fourth Amendment concerns because the defining characteristic of an encounter is the ability of the citizen to choose not to participate in the encounter or to simply walk away. *Id.* The contact remains an encounter only until a reasonable person would believe he is not free to leave and has yielded to the officer's show of authority or has been physically forced to yield. *Id.*

I disagree the initial contact between appellant and Deputy Smith was ever an encounter but instead was immediately an investigative detention thus implicating appellant's constitutional rights to be free from improper searches and seizures. Deputy Smith, who was in uniform and driving a marked patrol car, testified he pulled up beside appellant, exited his patrol car, identified himself as a police officer, and detained appellant to investigate the report of a suspicious person seen walking through the neighborhood. I would hold that under those circumstances, a reasonable person would believe he was not free to leave. In addition, the fact that appellant, who had initially begun walking away at a fast pace from Deputy Smith's patrol car, stopped once Deputy Smith exited his patrol car and identified himself as a police officer, demonstrates he had yielded to Deputy Smith's display of authority.

The majority's attempt to characterize the initial contact as an encounter is further undermined by their later use of appellant's walking away at a fast pace when he first saw Deputy Smith's patrol car, which is the defining characteristic of an encounter, as some evidence justifying Deputy Smith's detention and handcuffing of appellant. Thus, on the one hand, the majority, by labeling the initial stop as only an encounter, holds Deputy Smith did not need specific articulable facts creating reasonable suspicion to stop appellant. *See Florida v. Bostick*, 501 U.S. 429, 433, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (stating that in a consensual encounter, a police officer need not have any articulable reasons for initiating an encounter or approaching a citizen and asking questions because constitutional concerns are not implicated). Then, on the other hand, the majority uses appellant's exercise of his right to avoid an encounter

with police against him by labeling appellant's act of walking away from Deputy Smith as "unprovoked flight" thus contributing to reasonable suspicion to detain and handcuff him.[5] By engaging in such circular analysis, the majority demonstrates a cavalier disregard for the constitutional protections against illegal searches and seizures.

## B. Temporary Investigative Detention

### 1. Reasonable Suspicion Must Be Reasonable

An investigative detention occurs when a person is confronted by a police officer who, under a display of law enforcement authority, temporarily detains the person for purposes of an investigation. *State v. Garcia*, 25 S.W.3d 908, 911 (Tex.App.-Houston [14th Dist.] 2000, no pet.). An officer conducts a lawful temporary detention when the officer has reasonable suspicion to believe that an individual is violating the law. *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App.2005). Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Id.* This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.* An officer may not detain a person without a showing of reasonable suspicion, a particularized and objective basis for suspecting the particular person of criminal activity. *Klare v. State*, 76 S.W.3d 68, 72 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd). The detaining officer must point to something that would lead a rea-

sonable person to believe that the person being detained was engaged in a criminal act. *Id.* at 73. These specific, articulable facts must amount to more than a mere hunch or suspicion. *Davis v. State*, 947 S.W.2d 240, 244 (Tex.Crim.App.1997). The validity of a seizure is a dual inquiry: whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances that justify the interference in the first place. *Klare*, 76 S.W.3d at 73. A reasonable suspicion determination is made by considering the totality of the circumstances. *Ford*, 158 S.W.3d at 492–93. When the initial detention is unlawful, any evidence seized subsequent to the detention is inadmissible. *Gurrola v. State*, 877 S.W.2d 300, 302 (Tex.Crim.App.1994).

### 2. Deputy Smith Did Not Have Reasonable Suspicion to Detain Appellant

An examination of the testimony from the suppression hearing reveals that the specific, articulable facts cited by Deputy Smith are scant at best, and certainly there are none that would lead a reasonable person to believe that appellant was engaged in a criminal act. First, an anonymous citizen, standing on a public street, reported seeing a man dressed in black walking along a public street looking into houses. She did not report the manner in which the man in black was looking into houses or whether he approached them. During his suppression hearing testimony, Deputy Smith admitted walking along a street looking into windows is not illegal. The anonymous citizen chose to remain unknown as she did not want to get involved. Deputy Smith testified he did not even attempt to take any contact information from the anonymous citizen for that reason.[6] Next, Deputy Smith reported he

---

5. The majority makes this contention despite Deputy Smith's own testimony that appellant never attempted to flee.

6. The majority attempts to remove the cloak of anonymity from the anonymous citizen thus boosting her credibility by concluding, without any factual basis from Deputy

saw appellant, at approximately ten o'clock in the evening, dressed in black, walking along the sidewalk a short distance away from the anonymous citizen. Appellant initially quickened his pace when Deputy Smith approached in his patrol car but he did not attempt to flee. Appellant became nervous when Deputy Smith exited his patrol car and detained him. Appellant questioned Deputy Smith's reason for stopping him but did not resist being handcuffed. When viewed in an objective fashion, no known fact, or rational inferences from those facts, would support the conclusion that appellant was engaged in or soon would engage in criminal activity. *Davis*, 947 S.W.2d at 244.

The majority contends Deputy Smith corroborated sufficient aspects of the anonymous citizen's tip to justify detaining appellant. However, reasonable suspicion requires an anonymous tip to be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. *Johnson v. State*, 146 S.W.3d 719, 721 (Tex.App.-Texarkana 2004, no pet.). Therefore, an anonymous tip must be corroborated not only as to the identity of the individual sought to be accused, but also as to the improper nature of the conduct. *Hall v. State*, 74 S.W.3d 521, 525 (Tex. App.-Amarillo 2002, no pet.). In addition, innocuous conduct alone does not justify an investigatory stop for which reasonable suspicion is required unless there is other information or surrounding circumstances of which the police are aware. *Klare*, 76 S.W.3d at 73. Here, there was no additional information or surrounding circumstance known to Deputy Smith that would justify detaining appellant while he was engaged in the lawful activity of walking along a public sidewalk.

While the State characterizes appellant's conduct on the evening of November 3, 2005 as "highly suspicious," in actuality the only conduct seen by Deputy Smith or the anonymous citizen, was someone walking along a street, which Deputy Smith admitted is not illegal. In addition, acting nervous when detained by a police officer, which is the sole reason given by Deputy Smith for his decision to handcuff appellant, does not, alone, constitute grounds to reasonably suspect criminal activity is afoot. *Davis v. State*, 61 S.W.3d 94, 98 (Tex.App.-Amarillo 2001, no pet.). The Turtle Lake subdivision is not a high crime

---

Smith's testimony, that she "assumed responsibility for the accuracy of the information and could easily have been held accountable for its truth." The cases cited by the majority for this proposition are all easily distinguished because, unlike this case, which involves a report of non-criminal conduct that the anonymous citizen suspects might be somehow connected with prior or future criminal conduct, the cited cases involve an informant reporting specific details of *actual criminal conduct* observed by the informant. *See Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (case involved a known informant, who had previously provided accurate information to the officer, providing tip that the defendant was involved in illegal conduct that was immediately verifiable); *Bilyeu v. State*, 136 S.W.3d 691, 695 (Tex.App.-Texarkana 2004, no pet.) (informant reported suspected driv-

ing while intoxicated to police while in his vehicle which would have allowed police to identify him if needed); *Hawes v. State*, 125 S.W.3d 535, 537 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (informant, a wrecker driver, reported observing illegal conduct and he was readily identifiable because he had provided his name to the police dispatcher and was the driver of a tow truck, an easily identifiable vehicle, and he was ultimately identified and did testify at defendant's trial); *State v. Fudge*, 42 S.W.3d 226, 232 (Tex.App.-Austin 2001, no pet.) (informant made a face-to-face report to police officer that he had observed defendant engaged in specific criminal conduct); *State v. Garcia*, 25 S.W.3d 908, 910–11 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (anonymous informant made a face-to-face report to police officer that informant had observed actual criminal conduct).

area,[7] Deputy Smith testified he was not aware of any reports of burglaries on the evening of November 3, and time of day, while a factor that may be considered when determining whether an officer's suspicion was reasonable, is not suspicious in and of itself. *Klare,* 76 S.W.3d at 73–74. Based on the totality of the circumstances, Deputy Smith did not have specific, articulable facts upon which to base reasonable suspicion that appellant was engaged in suspicious activity justifying his detention.[8] Instead, Deputy Smith's detention of appellant was based on no more than a mere hunch and therefore constitutes an illegal detention. The majority, by allowing a police officer's hunch to suffice in place of specific, articulable facts, eviscerates *Terry's*[9] reasonable suspicion protection and thus removes the *reasonable* from reasonable suspicion. *See Ford,* 158 S.W.3d at 493 (emphasizing the requirement that a temporary detention must be based on specific, articulable facts).

I would hold that under the totality of the circumstances, Deputy Smith did not have reasonable suspicion that appellant was, or was about to be engaged in criminal activity, and the trial court abused its discretion when it denied appellant's motion to suppress.

## C. Arrest

The highest level of contact between police and a citizen is an arrest. *Gaines,* 99 S.W.3d at 666. A person is arrested when he has been actually placed under restraint or taken into custody by an officer. Tex.Code Crim. Proc. Ann. art. 15.22 (Vernon 2005). A person is deemed to be in custody if a reasonable person would believe that, under the relevant circumstances, his freedom of movement was restricted by the same amount associated with a formal arrest. *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996). Probable cause must accompany an arrest. *Gaines,* 99 S.W.3d at 666. Probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officer, and of which he has reasonably trustworthy information, are sufficient to warrant a reasonable person to believe that a particular person has committed or is committing a crime. *Id.* During an investigative detention, an officer may employ the force reasonably necessary to effect the goal of the detention: investigation, maintenance of the status quo, or officer safety. *Id..* However, if the force utilized exceeds that reasonably necessary to effect the goal of the stop, this force may transform an investigative detention into a full-blown arrest. *Id.* Whether a person is under arrest or subject to a temporary investigative detention is a matter of degree and depends upon the length of the detention, the amount of force employed, and whether the officer actually conducts an investigation. *Id.* Whether a detention is an actual arrest or an investigative detention depends on the

---

7. The fact an area is a high crime area or an area where certain types of illegal conduct frequently occurs, is insufficient, by itself, to justify detaining a person. *Gurrola,* 877 S.W.2d at 303 (Tex.Crim.App.1994).

8. The majority emphasizes Deputy Smith's training and experience in its determination that Deputy Smith had reasonable suspicion to detain appellant. While it is true that law enforcement training or experience may factor into a reasonable suspicion analysis, reliance on this training and experience is insufficient to establish reasonable suspicion absent objective factual support. *Ford,* 158 S.W.3d at 493 (Tex.Crim.App.2005).

9. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

reasonableness of the intrusion under all of the facts. *Id.*

Appellant contends he was arrested without probable cause when Deputy Smith handcuffed him almost immediately after he was detained. It is uncontested that once he was handcuffed, appellant was under restraint and no longer free to walk away from Deputy Smith. In addition, the State concedes that probable cause to arrest appellant did not arise until after Deputy Smith: (1) had handcuffed appellant; (2) reached into appellant's pocket and removed his wallet; and (3) found the baggy containing cocaine in appellant's wallet when he removed appellant's driver's license from the wallet. The majority does not address appellant's lack of probable cause to arrest contention but instead glosses over the handcuffing when it holds Deputy Smith's reaching into a handcuffed appellant's pants pocket to retrieve his identification was a momentary intrusion of no constitutional significance. The majority's position that Deputy Smith's reaching into appellant's pants to locate his identification was constitutionally insignificant is undermined by section 38.02 of the Texas Penal Code. *See* Tex. Penal Code Ann. § 38.02(a) (Vernon 2003). Under section 38.02, a person is only required to provide identifying information to a peace officer once that person has been lawfully arrested. *Id.* Even accepting the majority's view of the events, that appellant was still only detained after he was handcuffed, appellant had no legal obligation to provide identifying information to Deputy Smith. *Id.* Therefore, Deputy Smith violated appellant's constitutional rights when he reached into appellant's pants pocket searching for his wallet. In addition, because the record reflects that Deputy Smith did not conduct a pat-down *Terry* search of appellant's clothes, the retrieval of appellant's wallet cannot be justified as the legitimate byproduct of the discovery of an immediately recognizable weapon or contraband. *See Minnesota v. Dickerson,* 508 U.S. 366, 374–75, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (holding police may seize non-weapon contraband detected during a protective "pat-down" search for weapons under *Terry* when the contraband's contour or mass makes it's identity immediately apparent). Finally, any consent that may be inferred from the events was not voluntarily given because appellant had already been handcuffed. *See Manzi v. State,* 56 S.W.3d 710, 717 (Tex. App.-Houston [14th Dist.] 2001), *aff'd* 88 S.W.3d 240 (Tex.Crim.App.2002) (the fact a suspect was handcuffed when he gave consent weighs heavily against finding the consent was voluntary).

In support of the trial court's ruling, the State cites to several cases and points out that handcuffing a person during an investigative detention is not always the equivalent of an arrest. Because the special circumstances present in the cited cases are not present here, the principle they stand for is not applicable and thus provides no basis for ignoring the plain language of article 15.22 of the Code of Criminal Procedure. *See Balentine v. State,* 71 S.W.3d 763, 771 (Tex.Crim.App.2002) (while conducting investigation of shots being fired, officer handcuffed suspect being questioned in back of patrol car after discovering suspect lied to officer's previous questions and there was no bulletproof partition between front and back seats); *Rhodes v. State,* 945 S.W.2d 115, 118 (Tex. Crim.App.1997) (following a car chase of two suspects officer handcuffed suspect while his partner was chasing second suspect in a high crime area at night); *Mays v. State,* 726 S.W.2d 937, 943–44 (Tex. Crim.App.1986) (lone officer confronted two burglary suspects justifying the handcuffing while officer conducted investigation); *Wappler v. State,* 104 S.W.3d 661, 668 (Tex.App.-Houston [1st Dist.] 2003), *rev'd on other grounds* 138 S.W.3d 331 (Tex.Crim.App.2004) (in a custodial interrogation case, court held that officer's

handcuffing of an irate and belligerent DWI suspect was not an arrest but was for the purpose of completing investigation).

Because I believe a reasonable person, under the circumstances present here, would believe they were under arrest once they had been handcuffed, I disagree with the majority's resolution of this issue and would hold appellant was arrested without probable cause and any evidence obtained as a result of this unlawful arrest must be suppressed. Tex.Code Crim. Proc. Ann. art. 38.23(a).

### D. The Trial Court's Error Is Harmful

Because I believe the trial court erred when it denied appellant's motion to suppress, and this error is subject to harmless error analysis, I address whether this error is reversible. *See* Tex.R.App. P. 44.2. The error in this case violated appellant's federal and state constitutional rights. Further, the Court of Criminal Appeals has stated that appellate courts are not to speculate as to an appellant's reasons for pleading guilty or as to whether appellant would have pleaded guilty if a motion to suppress had been granted. *See McKenna v. State,* 780 S.W.2d 797, 799–800 (Tex. Crim.App.1989); *Kraft v. State,* 762 S.W.2d 612, 613–15 (Tex.Crim.App.1988). As long as the evidence that should have been suppressed "would in *any* measure inculpate the accused," an appellate court must presume that the trial court's denial of appellant's motion to suppress influenced appellant's decision to plead guilty and is reversible error. *See McKenna,* 780 S.W.2d at 799–800; *Kraft,* 762 S.W.2d at 613–15. Because the evidence seized as a result of the illegal detention of appellant is inculpatory, it must be presumed that the trial court's erroneous denial of appellant's motion to suppress influenced appellant's decision to plead guilty. Therefore, I would find that the error is reversible.

### Conclusion

I would find that Deputy Smith did not have reasonable suspicion based on specific, articulable facts that appellant actually was, had been, or soon would be engaged in criminal activity. As the State admits probable cause for arrest did not arise until after the cocaine was found in appellant's wallet, which did not occur until after appellant was handcuffed, I would find that appellant was arrested without probable cause. Under both situations, the error is harmful. Accordingly, I would reverse the trial court's judgment and remand for further proceedings in accordance with this dissenting opinion.