Donnie Bernard GAINES, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–01–01254–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 30, 2003.

Thomas R. Greene, Houston, for appellants.

Lori Deangelo Fix, Houston, for appellees.

Panel consists of Justices YATES, ANDERSON, and FROST.

## OPINION

JOHN S. ANDERSON, Justice.

Appellant Donnie Bernard Gaines was charged with the felony offense of possession with intent to deliver a controlled substance, namely cocaine, weighing over 400 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(f) (Vernon Supp. 2003). After the trial court denied his motion to suppress, appellant pleaded guilty pursuant to a plea bargain agreement with the State. In accordance with the plea agreement, the trial court sentenced appellant to 15 years confinement in the Texas Department of Corrections, Institutional Division, and fined appellant $1,000. Appellant filed a notice of appeal, "excepting to the ruling of the court on [appellant's] pre-trial motion to suppress evidence." We affirm.

## FACTUAL BACKGROUND

On February 15, 2001, Houston Police Department narcotics interdiction officer Sgt. Hans Meisel was working at Hobby Airport with Harris County Sheriff's Deputy Henry Palcios. Sgt. Meisel had ten years experience with the Houston Police Department. He was assigned to the public transportation task force and had worked at Hobby Airport for approximately four years. Deputy Palcios had thirteen years experience with the Sheriff's Department and had been working on the narcotics force at the airport for about a year and three months.

Both officers were in plain clothes at the airport. As they walked past the Southwest Airlines ticket line, appellant, who was standing in the line, turned around and stared at them, something the officers thought was unusual. According to Sgt. Meisel, there were people in front of appellant, and appellant was tiptoeing in an obvious attempt to see where the officers were going. The officers separated, and Deputy Palcios went to the ticket counter where appellant was not looking at the ticket agent who was attempting to give appellant his ticket. When Deputy Palcios told Sgt. Meisel about this behavior, Sgt. Meisel thought it unusual.

After receiving his ticket, appellant made no attempt to go through a security check or down the concourse to board a plane. Instead, appellant hurried outside to the parking garage, at one point nearly jogging. Appellant was wearing a t-shirt, a denim jacket, and long pants, and was wearing or carrying a Titan's overcoat.

The officers followed appellant, and Sgt. Meisel approached him in the parking garage, identified himself as a Houston police officer, and asked to talk with appellant. Appellant asked why and continued walking. Without specifying what he had observed, Sgt. Meisel then explained he worked at the airport on a regular basis and found appellant's actions suspicious. Sgt. Meisel again asked to talk with appellant. Appellant again asked, "Why?" Sgt. Meisel repeated he was a police officer, and appellant replied, "I am going home," and continued walking. Appellant had a Southwest ticket in his hand, and when

Sgt. Meisel asked whether it was his ticket, appellant said, "Yes."

Appellant went down the parking garage stairs, with Sgt. Meisel alongside, and Deputy Palcios behind. Appellant appeared nervous as he descended the stairs. When appellant turned right onto the parking lot from the stairs, Sgt. Meisel saw a bulge on appellant's lower waist area. Based on his training and experience, Sgt. Meisel thought the bulge was a weapon and was concerned for their safety. He informed Deputy Palcios he thought appellant had a weapon. At that point, appellant stopped and "kind of raised his arms." A uniformed Houston police officer, Officer Spears, was directing traffic a few yards away, and Sgt. Meisel also told Officer Spears he thought appellant had a gun. Officer Spears immediately came over, placed appellant against a truck, and patted appellant down.

After not finding anything when Spears patted appellant down from the back, Spears turned appellant around, discovered the bulge, and said, "Yeah, here it is," a statement Sgt. Meisel interpreted as referring to a weapon. Sgt. Meisel lifted appellant's shirt and saw a brick of cocaine in appellant's waistband. Appellant was placed in custody and taken to the police office at the airport, where Sgt. Meisel removed the cocaine. The substance field-tested positive for cocaine and weighed a kilogram.

Appellant testified he saw the officers for the first time in the parking lot stairwell. He testified Sgt. Meisel touched him three times during the interaction, once "chucking" appellant waist high. According to appellant, Sgt. Meisel told Spears to check appellant's waistband, Officer Spears then did so, and said "Oh, I feel something." At that point, Sgt. Meisel walked up, raised appellant's shirt, and said, "Oh, here it is."

The trial court denied appellant's motion to suppress and entered a written order to that effect. Appellant then pleaded guilty. The plea form contains a handwritten statement, "Defendant reserves his right to appeal the adverse ruling on defendant's pretrial motion to suppress evidence." Appellant initialed the preprinted provision indicating, if the punishment did not exceed that recommended by the prosecutor and agreed to by appellant and his attorney, the court must give its permission for appellant to appeal "on any matter in this case except for those matters raised by you by written motion filed prior to trial." The form also contains a preprinted statement, "I waive any right of appeal which I may have should the court accept the foregoing plea bargain agreement between myself and the prosecutor." The latter statement is not lined out. In the judgment, in the section under special instructions or notes, the following, handwritten, statement is lined out: "Appeal waived, No permission for appeal granted."

## DISCUSSION

In a single issue, appellant challenges the trial court's denial of his motion to suppress the evidence seized as a result of his warrantless arrest. He argues the officers had no reasonable suspicion or probable cause to detain him and no evidence to support a reasonable concern for their safety such as would justify a *Terry* search.[1] He also contends there was no evidence to justify seizure of the cocaine discovered during the *Terry* search. The State responds (1) appellant, by virtue of the terms of his plea agreement, has waived his right to appeal and this court lacks jurisdiction over the appeal, (2) the

---

1. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

detention and frisk of appellant were lawful, and (3) the cocaine was legally seized under the "plain view" doctrine.

## I. Threshold Issues

■ *A. Waiver.* To support its waiver argument, the State relies on a single pre-printed sentence on the plea form, which reads, "I waive any right of appeal which I may have should the court accept the forgoing plea agreement between myself and the prosecutor." The State argues this provision controls over the following hand-written notation on the plea form: "Defendant reserves his right to appeal the adverse ruling on defendant's pretrial motion to suppress evidence." The State contends the handwritten notation, just above the preprinted waiver, was a pre-plea attempt to reserve his appeal rights, which did not survive the trial court's acceptance of the plea bargain. There is no reporter's record of the plea hearing, and the State does not explain why the following notation on the judgment was lined out: "Appeal waived, No permission for appeal granted." On this record, we conclude appellant did not waive his right to appeal. *See Alzarka v. State,* 90 S.W.3d 321, 324 (Tex.Crim.App.2002) (holding defendant did not waive appeal and that record—in which trial judge, district attorney, and defendant's attorney repeatedly made statements agreeing defendant would be permitted to appeal—directly contradicted and rebutted any presumption raised by terms of boiler plate plea form defendant signed). *Cf. Freeman v. State,* 913 S.W.2d 714, 716–17 (Tex.App.-Amarillo 1995, no pet.) (concluding record was clear appellant waived right to appeal when record showed trial court asked appellant whether he was waiving or giving up right to appeal and appellant answered "yes.").

■ *B. Jurisdiction.* The State also implies the notice of appeal was insufficient to confer jurisdiction on this court.

Citing Texas Rule of Appellate Procedure 25.2(b)(3)(C), the State argues this court has no jurisdiction because the record does not reflect the trial court gave appellant permission to appeal. Subsection (b)(3), however, provides in its entirety:

> But if the appeal is from a judgment rendered on the defendant's plea of guilty or nolo contendere under Code of Criminal Procedure article 1.15, and the punishment assessed did not exceed the punishment recommended by the prosecutor and agreed to by the defendant, the notice must:
>
> (A) specify that the appeal is for a jurisdictional defect;
>
> (B) specify that the substance of the appeal was raised by written motion and ruled on before trial; or
>
> (C) state that the trial court granted permission to appeal.

Tex.R.App. P. 25.2(b)(3).

In his notice of appeal, appellant stated he was "excepting to the ruling of the court on [appellant's] pre-trial motion to suppress." This satisfies Texas Rule of Appellate Procedure 25.2(b)(3)(B), giving this court jurisdiction to hear the appeal.

## II. Denial of Appellant's Motion to Suppress

*A. Standard of review.* We review a trial court's decision on a motion to suppress under an abuse of discretion standard. *See Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996). Under this standard, we give almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Loserth v. State,* 963 S.W.2d 770, 772 (Tex.Crim.App.1998); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). We also give the same amount of deference to the trial court's ruling on

"application of law to fact questions"—also known as "mixed questions of law and fact"—if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. An appellate court reviews de novo "mixed questions of law and fact" not falling within this category. *Id.*

When, as in this case, the trial court makes no explicit findings of historical fact, we presume it made those findings necessary to support its ruling, provided they are supported in the record. *See Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000). Similarly, we view evidence in the light most favorable to the trial court's ruling on mixed questions of law and fact. *See Guzman*, 955 S.W.2d at 89.

■ *B. Legality of the detention.* There are three distinct categories of interactions between police officers and citizens: encounters, investigative detentions, and arrests. *State v. Perez*, 85 S.W.3d 817, 819 (Tex.Crim.App.2002) (citing *Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim.App.1996) (Baird, J., concurring in affirmance of court of appeals judgment, dissenting from decision to dismiss petition)).

■ An encounter is a friendly exchange of pleasantries or mutually useful information and does not implicate Fourth Amendment concerns. *See Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (per curiam); *Francis v. State*, 922 S.W.2d at 178 (Baird, J., concurring and dissenting); *Josey v. State*, 981 S.W.2d 831, 838 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd). At this level the police are not required to possess any particular level of suspicion because the citizen is not compelled to stay. *See Francis*, 922 S.W.2d at 178; *Josey*, 981 S.W.2d at 838.

■ The exchange remains an encounter until a reasonable person would believe he is not free to leave and has yielded to the officers' show of authority or has been physically forced to yield. *Munera v. State*, 965 S.W.2d 523, 527 (Tex. App.-Houston [14th Dist.] 1997, pet. ref'd). Then, for purposes of both the Fourth Amendment and Article I, § 9 of the Texas Constitution, the citizen has been seized. *Johnson v. State*, 912 S.W.2d 227, 235–36 (Tex.Crim.App.1995). An investigative detention, which is a seizure, is a temporary and narrowly tailored investigation directed at determining a person's identity or maintaining the status quo while the officer obtains more information. *Dean v. State*, 938 S.W.2d 764, 768 (Tex. App.-Houston [14th Dist.] 1997, no pet.). At this level, the officer must have specific articulable facts, in light of his experience and personal knowledge, together with inferences from those facts, which would reasonably warrant the intrusion on the freedom of the citizen. *Francis*, 922 S.W.2d at 178; *Josey*, 981 S.W.2d at 838. The articulable facts must create some reasonable suspicion that (1) an activity out of the ordinary is occurring or has occurred, (2) some suggestion to connect the detainee with the unusual activity, and (3) some indication that the unusual activity is related to a crime. *Davis v. State*, 947 S.W.2d 240, 244 (Tex.Crim.App.1997).

■ The highest level of contact is an arrest, which is also a seizure, but not as brief as an investigative detention. *Francis*, 922 S.W.2d at 178. Probable cause must accompany an arrest. *Id.* Probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officer, and of which he has reasonably trustworthy information, are sufficient to warrant a reasonable person to believe that a particular person has committed or is committing a crime. *See Guzman*, 955 S.W.2d at 87.

In the present case, the encounter became a detention either when appellant, who had been continuously evading the officers, stopped and raised his arms, or immediately thereafter when Officer Spears placed him up against the truck. *See Roy v. State*, 55 S.W.3d 153, 157 (Tex.App.-Corpus Christi 2001) (holding detention occurred after officer observed large bundle near suspect's waist and handcuffed suspect for further investigation), *pet. dism'd, improvidently granted, per curiam*, 90 S.W.3d 720 (Tex.Crim. App.2002). At either point, the officers were aware of the following specific articulable facts: (1) while waiting in line with his luggage at the ticket counter, appellant stared at Sgt. Meisel and Deputy Palcios, to the degree appellant was standing on tiptoe at times and did not look at the ticket agent when the agent was trying to hand him the ticket; (2) instead of proceeding to the boarding area, as ticketed passengers typically do, appellant went outside to the parking lot, walking so fast he was almost jogging as the officers followed him; and (3) appellant seemed nervous. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (stating Supreme Court cases have recognized nervous, evasive behavior as pertinent factor in determining reasonable suspicion for *Terry* stop; and headlong flight is the consummate act of evasion—not necessarily indicative of wrongdoing, but certainly

suggestive of such).[2] In addition, (1) appellant was wearing or carrying a large, bulky coat; (2) in the parking lot, when Sgt. Meisel asked whether the ticket appellant was carrying was his, appellant said, "yes," but appellant also stated he was "going home"; and (3) Sgt. Meisel observed a bulge at appellant's waist, which, according to Palcios, is a place people frequently conceal weapons.

The facts in the present case compare favorably to those the United States Supreme Court held constituted reasonable suspicion justifying a seizure in *Rodriguez*:

Before the officers even spoke to the three confederates, one by one they had sighted the plainclothes officers and had spoken furtively to one another. One was twice overheard urging the others to "get out of here." Respondent's strange movements in his attempt to evade the officers [an attempt to move away in which respondent's legs were pumping up and down very fast but not covering much ground, as if he were running in place] aroused further justifiable suspicion, and so did the contradictory statements concerning the identities of Blanco and respondent. Officer McGee had special training in narcotics surveillance and apprehension; like members of the Drug Enforcement Administration, the Narcotics Squad of the Dade County Public Safety Department is "carrying out a highly specialized law enforcement operation designed to com-

---

**2.** Indeed, the *Illinois v. Wardlow* Court noted its holding in *Florida v. Royer* that when an officer without reasonable suspicion or probable cause approaches an individual, the individual has a right to ignore the police and go about his business. 528 U.S. 119, 125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983)). Any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. *Id.*

(citing *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991)). But unprovoked flight is more than mere refusal to cooperate. Flight by its very nature is not going about one's own business; in fact, it is just the opposite. *Id.* The *Wardlow* Court concluded that allowing officers confronted with such flight to stop the fugitive and investigate further is consistent with the individual's right to go about his business or stay put and remain silent in the face of police questioning. *Id.*

bat the serious societal threat posed by narcotics distribution." *United States v. Mendenhall, supra,* 446 U.S. [544] at 562, 100 S.Ct. [1870], at 1881 [64 L.Ed.2d 497 (1980) ] (POWELL, J., concurring in part and concurring in judgment). Respondent "was approached in a major international airport where, due in part to extensive antihijacking surveillance and equipment, reasonable privacy expectations are of significantly lesser magnitude...." *Florida v. Royer, supra,* 460 U.S., at 515, 103 S.Ct., at 1333 (BLACKMUN, J., dissenting). 469 U.S. at 6, 105 S.Ct. at 311. Just as the facts known to the officers in *Rodriguez* created reasonable suspicion, so the facts known to the officers here justified their suspicion that appellant was involved in criminal activity, and, therefore, justified their further investigation.[3]

■■■■ ***C. Legality of the Terry search.*** Law enforcement personnel may conduct a limited search for weapons of a suspect's outer clothing, even without probable cause, when an officer reasonably believes the suspect is armed and dangerous to the officer or others in the area. *Balentine v. State,* 71 S.W.3d 763, 769 (Tex.Crim.App.2002) (citing *Terry,* 392 U.S. at 27, 29, 88 S.Ct. 1883, 1884; *Carmouche,* 10 S.W.3d at 329). " 'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.' " *Id.* (quoting *Adams v.*

*Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)). Such a "weapons frisk" is justified only when the officers can point to specific and articulable facts which reasonably led them to conclude the suspect might possess a weapon. *Id.* (citing *Carmouche,* 10 S.W.3d at 329). The officers need not be absolutely certain an individual is armed; rather, the issue is whether a reasonably prudent person would justifiably believe that he or others were in danger. *Id.* (citing *O'Hara v. State,* 27 S.W.3d 548, 551 (Tex.Crim. App.2000)).

■■■■ In the present case, Sgt. Meisel observed a bulge in the front of appellant's pants, and believed the object was a weapon. Sgt. Meisel conveyed this information to the uniformed officer who patted appellant down. According to Deputy Palcios, the object was located in an area where people commonly carry weapons. Deputy Palcios also explained they thought it suspicious appellant had not entered the metal detector area at the airport. These specific and articulable facts reasonably led the officers to conclude appellant might possess a weapon. *See Roy,* 55 S.W.3d at 157 (holding pat down at airport justified after officer observed bundle under suspect's clothing near waist); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 111–12, 98 S.Ct. 330, 334, 54 L.Ed.2d 331 (1977) (concluding bulge in driver's jacket permitted officer to conclude driver was armed and posed serious and present danger to officer's safety).[4]

---

**3.** Appellant contends his behavior was no different from that of "thousands of people who go to the airport to buy airline tickets for flights at a later date." In *Woods v. State,* however, the Texas Court of Criminal Appeals held "the 'as consistent with innocent activity as with criminal activity' construct is no longer a viable test for determining reasonable suspicion." 956 S.W.2d 33, 38 (Tex.Crim. App.1997). When such activity creates an ambiguity, *Terry* recognizes that the officers can detain the individuals to resolve the ambi-

guity. *See Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85.

**4.** Appellant suggests the officers' testimony failed to establish a reasonable fear for their safety. Regardless of whether an officer testifies he was afraid, a court analyzes the validity of the search by determining whether the facts available to the officer at the time of the search would warrant a reasonably cautious person to believe the action taken was appropriate. *O'Hara v. State,* 27 S.W.3d 548, 551

**D. Seizure of the cocaine.** Finally, appellant argues the *Terry* frisk did not permit removal of items that do not feel like weapons. In the present case, Officer Spears, the uniformed officer who conducted the search, did not testify at the suppression hearing, and the record, therefore, is devoid of any evidence of his tactile perceptions as he patted appellant down.[5]

Nevertheless, according to Sgt. Meisel, Officer Spears, in the course of conducting the frisk, said, "Yeah, here it is." Sgt. Meisel, who had just informed Spears he thought appellant had a weapon, believed Spears was referring to a weapon. Although appellant's version of the frisk differed from Sgt. Meisel's, it was for the trial court to evaluate the credibility of Sgt. Meisel's testimony and determine the weight to give it. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App.2000). From this testimony, the trial court could reasonably infer that Sgt. Meisel lifted appellant's shirt to remove what he reasonably believed was a weapon.[6] Once Sgt. Meisel lifted appellant's shirt, however, he saw "a normal package of kilo cocaine," wrapped in cellophane.

At this point, reasonable suspicion ripened into probable cause for the officers to believe appellant was then committing the offense of possession of cocaine, thus permitting the officers to arrest appellant without a warrant. *See* Tex.Code Crim. Proc. Ann. art. 14.01 (Vernon 1977) (permitting warrantless arrest when offense committed in officer's presence or within his view). The officers took appellant to their office, where they removed the cocaine. The seizure of the cocaine was justifiable as incident to appellant's arrest. *See Rogers v. State*, 774 S.W.2d 247, 264 (Tex.Crim.App.1989) (stating searches of person and area within person's immediate control are excepted from warrant requirement when incident to lawful arrest of such person and otherwise proper in scope).

We overrule appellant's sole issue.

We affirm the judgment of the trial court.

---

(Tex.Crim.App.2000). Here, Officer Meisel testified that, after observing the object in appellant's waistband, he was concerned about his own and his partner's safety

5. Even when the issue is what an officer felt in the patdown, "because 'weapons are not always of an easily discernible shape,' it is not inevitably essential that the officer feel the outline of a pistol or something of that nature." 4 Wayne La Fave, Search and Seizure § 9.5(c) (3d ed.1996).

6. "[W]e will assume that the trial court made implicit findings of fact supported in the record that buttress its conclusion." *Carmouche*, 10 S.W.3d 323, 328 (Tex.Crim.App.2000).